All right. The next case of the morning is Kopp v. Klein, No. 16-11590. I sold my IDR stock a long time ago, all 50 bucks worth. Thank you, Judge Jones. I'm not recused. May it please the Court. Mr. Mann. Ronald Mann on behalf of Randy Kopp. Husserl Mann. This is an ERISA case involving the pension plan of a failed Yellow Pages company, which you're familiar. We allege that the insider managers of the pension plan breached their fiduciary duties under ERISA of loyalty and prudence. The first claim in the complaint, and the one I'd like to focus on first, is the duty of loyalty, which is discussed in detail in your opinion in Perez v. Brewster. We think that that's the simplest of the claims. This Court has three recent decisions on the duty of loyalty, two which I would characterize as the Boussian case, the Metzler case, and the Perez case. Judge Jones obviously wrote two of those. I think those cases established two things about these loyalty claims about ERISA plans that own employee stock. One, they established that the managers of these plans are supposed to manage them entirely for the benefit of the beneficiaries. And so in each of those cases, there was nothing wrong about having insiders run the pension plan in the first place. But when a conflict arises, so the interests of the firm and the insiders depart in the interest of the beneficiaries, and in most of those cases, the people adopt some sort of independent person to decide what to do. You're here on the asserted claim of breach of the fiduciary obligation of a prudence, correct? We claim ERISA has two fiduciary duties. There's a duty of loyalty and a prudence. What are you here on today? We're also here on prudence. I wanted to start with loyalty because I think it's simpler. I just wanted to start with loyalty because it's simpler. I'm happy to talk about prudence if you prefer. Well, I have a couple of questions about loyalty. Frankly, thinking it is the less important issue here. Unlike Perez, as you know, Mr. Brewster had decided to line his own pocket, so to speak. I personally think he was a victim of real bad advice. But he decided to sell out his and his wife's stock to the plan, and everything depended upon the valuation to the plan. So I question whether that, for you, is distinguishable. Second, we held in the first cop decline that this was not an impermissible violation of the duty of loyalty because the compensation, let's see, because cop does not allege that the compensation was impermissibly tied to the price of the stock, but that it was impermissibly tied to IDR's financial position, and no court has ever held that that was a breach of the duty of loyalty. In other words, we ruled on it in the first appeal, and arguably that's law of the case. All right. So I'll take the second question first because it's more interesting and I think you know what you meant in Perez. In cop, I think it's somewhat difficult to know what to make about that passage. It also follows a passage where you said that the reason these claims are being dismissed is because they were derivative. And I think it's fair to say that in the period when the Munch presumption arose, courts of appeals tended to dismiss both prudence and loyalty claims based almost entirely on that presumption. So our clients filed a cert petition in the Supreme Court challenging the dismissal of prudence and loyalty claims based on the presumption, theory being if you get rid of the presumption, both the claims would come back. The Supreme Court vacated the decision in its entirety, so now there's no further opinion. It comes back and you told the district court start over, try again in light of whatever Dudenhofer says. Now it's clear that analysis of claims related to duty of loyalty after Dudenhofer should be very different from the way they were before Dudenhofer because before Dudenhofer there was an overwhelming sense that if you're running a plan that owns employer stock, what you're supposed to do is buy employer stock. And anything you do to buy employer stock is okay unless the company is near bankruptcy. Now after Dudenhofer, that can't be true for the reasons explained with great vigor in Part 3 of the Dudenhofer opinion. In Part 3 of that opinion, the court destroyed the foundation for that presumption. The court said the key part of it is this explanation of how Congress would set up a special system for plans that own employee stock. So the statute is even easier for claims of loyalty than it is for claims of prudence because with respect to claims of prudence in Section 1104A2, there's an exception where the duty of prudence is watered down some for plans that own employer stock because the duty of diversification is taken away. It says the prudence requirement only to the extent it requires diversification is not violated by owning employer stock. But that exception doesn't even apply to the duty of loyalty. So the duty of loyalty, after Dudenhofer has eradicated Munch, has to apply to these plans just as it does to all plans. So basically if you offer company stock in a retirement plan and you also offer stock incentives tied to individual bonuses or something and the stock goes down and the people who get such bonuses happen to be members of the, as they are allowed to be, members of one of the planned fiduciary committees, you can sue them. Is that right? So what does that do? This puts companies in the very difficult position of either not offering executive compensation or not offering their own stock, which of course Congress certainly is totally contrary to what Congress intended. Absolutely not. And that's the heart of the matter, Judge Johnson. I'm glad we've gotten to that point. That's exactly what's happened since Donovan v. Beerwith, which you cite approvingly repeatedly in all these cases. There's nothing wrong with having insiders run employee pension plans, just like there's nothing wrong with having insiders run the company. But big publicly traded companies frequently come upon a point in time where the interests of the officers and directors diverge from the interests of somebody else, and so they have to go get an independent person to make decisions. If they want to sell the company, they have to hire an independent person to assess the price. If there comes a point where the people that are running the pension plan can't act in the interests of the fiduciaries. Why do they have disparate interests in the first place? Because all of them have a basic interest in maintaining the value of the stock, right? Well, it depends on what's going on inside the company. Well, if it's my ERISA plan, if it's my EIAP, I want the stock to stay high, and so does the guy who's two or three levels above me in the pecking order. Well, think about a case just to pick one like Enron. Did the insiders in Enron have the same interest as the employees in managing Enron stock in the months and years before the company failed? They didn't. They have interests in the company that are different than the interests of the employees. Actually, if you ask the guy who was one of the top officials there who got divorced and his wife sold the stock six months before the deal, I bet you'd say her interests were very similar to those of the rest of the people, okay? Yes, but if we found out here that— I just don't understand this. I just don't see how your argument— tie it to the facts of this case so your argument doesn't totally conflict with this. Well, let's pick November and December 2008, and there comes a point in time where there's a decision to stop buying any more employee stock. Right. Okay, and then the decision is countermanded and taken away just a few days later. Suppose that the reason that decision was countermanded and taken away was not because people decided that was the benefit of the employees. It was because they decided they really needed to keep the problems with the company quiet for just a few more months so they could sell their own stock. Well, could they trade—could they— well, you don't make any allegations of that, number one, and number two, well, you don't. But this is not a securities case, so we don't have to actually allege our entire proof of fact before we just get a complaint. This is an ERISA case. Well, you have to allege facts by Twombly. We do. We do allege facts by Twombly, and I think that if you look at the facts here— I didn't understand you to allege that. I think if you compare the cases like Boosian— Did you allege that or not? I'm sorry? Did you allege what you just told, Judge? No, no. But what we did allege is that the interests of the managers and the interests of the employees had diverged because the managers— That's just purely a conclusion, and that doesn't make Twombly. Well, the managers— Why is it—you have to say why. The managers, according to the complaint, and I think this is not really subject to doubt, were producing false financial statements and fabricating the state of the accounts receivable of the companies. And so they had a strong interest in keeping this behavior obscured from the public. And so any activity that they took to acknowledge what was going on in the company would have caused personal problems for them that would not affect the employees. They only care about the pension plan. In each of these other three cases that you've considered, when the time clumps or the interests diverge— What should the fiduciaries have done here? Well, what the fiduciaries have done in the three previous cases you've had is they all— What should they have done here? What they should have done here is the same thing has happened in the three previous cases, which is have an independent person decide what — how to respond to the change in the company's financial position. How is that going to solve anything? That's just — somebody else has got to make the decision. My question is what decision could anybody make at that juncture? They couldn't stop purchasing stocks? Well, look, this is a company that's dying. The quarterly earnings are going south. The revenue is going south. That's public information. That's right. And they're sitting there with inside information. And Dudenorff reminds us, of course, that you can't violate the law as insiders. So now you tell me what was it they were supposed to do? The only thing I read here is that, well, they didn't meet enough. They could have stopped buying the stock. They could have liquidated — Oh, wait, wait, wait, wait. Dudenorff says that they have to make the judgment that anything that they may do will not make the situation worse. And then what happens if the public happens? They say we're going to stop buying the stock. They don't have to do that under the duty of loyalty, and the duty of loyalty — Act on inside information. Right. That's correct. But when corporate officers come to a situation where they're constrained by their own duties from acting as the best interest of the beneficiaries, typically they appoint an independent person to decide. So in Perez, he appointed an independent person to decide. Okay, now what could they have decided to do? They could have decided that this is a super risky stock, which is an objective fact, has a super high beta, and pension plans shouldn't own stocks that have betas that high. Let me ask you a question. These are individual retirement plans. Yes. And it seems to me that your plaintiffs could have opted not to keep investing their retirement money in the company's stock. This was exactly the opposite of Enron, because in Enron, I personally attended a fundraiser six months — a charity deal — six months before Enron filed bankruptcy, where Ken Lay said, we're going to be the biggest company in the world. So it was a house of cards, and then when the bottom started coming loose, nobody really had expected that. Whereas in this case, everything's quite public about the Internet and the Yellow Pages. I think the question is, and you see the same, the facts of this case and Tatum both show that the people who are running the plan had choices to make, decisions to be made. But I'm still asking you, why didn't the employees know everything they needed to know from the — from what was happening? Couldn't they opt out at any point? But ERISA isn't satisfied by the knowledge of the employees. ERISA imposes fiduciary duties on these people. What you have to ask yourself is, could a fact finder read all of this and conclude that, after what we might learn in discovery, that these people did not make the decisions that they made, the decision to keep buying stock, the decision not to liquidate, did they make that decision because they decided that was the best thing for the employees, or did they make that decision at least in part because it was good for them? And I think a fact finder obviously could conclude that they made it in part because it was good for them. And if they did — How do you — I mean, have you — have you alleged that everyone — that the people on that committee were the people — and see, now we've gone all the way on duty of loyalty, I'm afraid. But have we alleged that the people on that committee, every one of them was violating the securities laws or knew that the securities laws and material facts were being concealed and therefore didn't want to go to jail, blah, blah, blah? We're not — we haven't alleged that. We've simply alleged that their interests, because their interests were tied to the continuing success of the company, because they were insiders working there, were different from the interests of the employees. This is the employees' pension plan. But everybody has the same interests in the way you — In some — but in some cases, so you look at the RGR Nabisco, what their fiduciaries decided is we need to divest the stock. This looks like this is going to go south. We need to divest. They came very close to divesting here, and then they stopped and decided not to. And if the reason they did that is for something that was related to their own interests as opposed to the interests of the employees, that's a clear violation of ERISA, the duty of loyalty. I should say on the duty of prudence that I think if you read the opinion in Tybill in the few court of appeals cases that talk about it, you would see that this is — the allegations here squarely fall within that case. Well, you have time for rebuttal. Mr. Landau. Thank you, Your Honor. May it please the Court. I'm Chris Landau, and I'm here today for the defendant's appellees. In Fifth Third, the Supreme Court set a very high bar for claims alleging a violation of ERISA's duties of prudence in cases involving employer stock. And that's for a reason. And I think this came up earlier in some of the Court's questions, because Congress has a policy of wanting to encourage employers to invest in employer stock. I think Congress has made the decision, whether it's a good decision, bad decision, that is Congress's decision that this is a good thing overall. So the Supreme Court in Fifth Third, while it said there's no basis for a presumption of prudence in the law, in Part 3 of its opinion, which my friend read in part here this morning, in Part 4 of that opinion, the Supreme Court proceeded to say, but we are — even though there's no presumption, we're going to — the Iqbal-Twombly pleading standard applies in this context, as in every other context, and it has real teeth in this context. In particular, if you bring a claim based on — either you have a claim based on insider information on a company or a claim based on public information. Claims based on insider information can't — you have to make a plausible allegation that it doesn't violate the securities laws to pass the motion to dismiss. And even if it doesn't, you have to make now a plausible allegation that it would do — it wouldn't do more harm than good. For claims based on public information, the Supreme Court said basically the stock price reflects — in an efficient market, presumably the stock price reflects all public information. And unless you can show that there's not an efficient market, which is, again, kind of a unicorn situation, then you can't bring a claim here. So I think the bottom line is, after Fifth Third, the kind of claim that my friends are seeking to bring here is essentially a unicorn claim, and they're seeking to basically bring a bulldozer and make it a claim that you can bring in all situations. They're trying to turn the unicorn into, like, a regular — I'm mixing metaphors here, but it could be a goat or a regular horse or something that you see every day. And — and, you know, that is fundamentally — But you're saying their claim is one that's based on what was public information? Yes. And I think they, on page 30 of their brief, Your Honor, have disavowed in this appeal at least — They concede that it's not based on any nonpublic information. Well, just to be clear, in their latest complaint, which is the subject of this appeal, they do bring claims based on nonpublic information as well. But then on page 30 of their blue brief in this Court, they say, well, we think that Whitley, which is this Court's post-Fifth Third precedent, can be distinguished, but the strength of the other arguments for reversal that we present above persuades us that it would be an inappropriate use of judicial resources to present those arguments to this panel for decision. So as I understand their position, they have said, we're not even going to try to defend our nonpublic claims. So the only issue, as I understand their position in this Court, based on what they say on page 30 of their opening brief, is that they're seeking claims based on public information. And the Supreme Court made clear that if there is any exception at all, it is this narrow exception that really has its genesis in the securities laws, going all the way back to the LTV case and Basic, Inc., that one presumes that public markets, frankly, of which the New York Stock Exchange, where IDR stock was listed, is the quintessential efficient market. What they have to do is basically show that they have raised a plausible allegation is that there was inefficiency in the New York Stock Exchange with respect to IDR, the information regarding IDR. They really try to tax to get around Fifth Third with respect to the duty of prudence. First, they say, well, that's for claims based on value, and we're not making a value claim, we're making a risk claim. That's really a false dichotomy. And Fifth Third itself, if you look at the face of the Supreme Court opinion in Part 4, specifically refutes that. This is now 134S Court at 2472. The passage says, this is the Supreme Court talking. In this case, the court of appeals held that the complaint stated the claim because the plaintiffs alleged that Fifth Third engaged in lending practices that were equivalent to participation in the subprime lending market, that defendants were aware of the risks of such investment by the start of the class period, and that such risks made Fifth Third an imprudent investment. The court of appeals, this was the Sixth Circuit in that case, did not point to any circumstances rendering reliance on market price imprudence, imprudent. The court's decision to deny dismissal therefore appears to have been based on an erroneous understanding of the prudence of relying on market price. So in Fifth Third itself, the Supreme Court specifically said that a claim that purported to be about risk, and that the Sixth Circuit had kept alive based on risk, didn't work because the markets presumably incorporate risk as well as all other factors into the market price. So the idea that somehow risk claims are outside the Fifth Third framework is — has no basis in Fifth Third itself. And, again, frankly, that would allow plaintiffs to drive that truck through Fifth Third and routinely make these kind of claims in every case. And that's why each one of your fellow circuits to address this issue of whether risk claims are outside the Fifth Third framework in the wake of Fifth Third, which is the D.C. Circuit in Coburn, the Second Circuit in Reinhart, and the Sixth Circuit in Salmer, has specifically rejected this argument. I don't see them really making any serious effort to distinguish those cases as opposed to just saying that they're wrongly decided. And, frankly, even if you could say that somehow risk was distinct from value, which the Supreme Court has rejected, there's no way to say that risk is different than diversification, which is specifically off the table in claims involving company stock, because the risk is not inherently bad. The risk is fine as long as you are diversified. So if there's — if these kind of holdings of stock are immune from a diversification requirement, you can't really have a risk-based claim. And this Court's opinion in Kirschbaum really, I think, very clearly highlights the inextricably linked nature between diversification and risk. The plaintiff's next attempt to get around the Fifth Third by saying, well, you all were engaged in a fraud, and the fraud renders the presumption of an efficient market, you know, inept. And this is really the new thing that they allege in their Third Amended complaint to try to get around Fifth Third. But that really misunderstands what the special circumstances exception that the requires. In Fifth Third, the Supreme Court's emphasized that what it means there is the reliability of the market — the hypothetical — excuse me, the efficient market hypothesis relies on the reliability of the market price, and I'm quoting from Fifth Third at 2472. The reliability of the market price is an unbiased assessment of the security's value in light of public information. So what they're basically saying is that the public markets, an efficient market like the New York Stock Exchange, presumably the market price reflects all public information. And so if they want to bring a claim based on fraud or hidden information, that's a different kind of claim, and they have to pursue that claim through the mechanism that the Supreme Court outlined in Fifth Third for nonpublic claims. But as we started out earlier, I think, Judge Graves, with some of your questions, here it seems to me we're clearly on — they have said we're only on the public side of the equation, and so they can't bring up nonpublic information as the basis for making a public information kind of claim. So that doesn't work. Then they've also thrown in this procedural duty of prudence. And, of course, fiduciaries have a responsibility to monitor investments. You can't buy some stock in 1989 and then just keep it for 30 years and never check on it. But that doesn't mean that you can plausibly allege an ERISA claim, stock drop claim, like they're alleging here, based on a purely procedural violation that they can't causally link to any losses. Under ERISA Section 1109, to bring this kind of a claim, you have to have losses. And it's kind of like in any other area of the law. You can't just say, well, they violated some procedural duty, therefore I get to go to court. I mean, typically, legal — the right to seek redress in court, you have to show some kind of injury. You can't just say, well, this person, you know, they should have crossed their T's and dotted their I's. You have to show how their failure to do so amounted to some losses. So where they don't have a plausible substantive duty of prudence claim, the procedural duty of prudence doesn't get them anywhere. And Tybill was really just a statute of limitations case anyway. It said basically, again, that for limitations purposes, the duty to monitor keeps such a claim alive and it's triggered as of the date that the monitoring allegedly didn't occur. But Tybill never suggested that you could bring a claim based on procedure alone without any substantive losses, which, again, just kind of makes common sense. The — again, the whole point of monitoring is to turn up something bad. If you don't have something bad, the monitoring really is kind of by the by. And so I think it's not surprising, then, that we find ourselves here today where my friend, instead of wanting to talk about any of these duties of prudence, says, well, let's just forget about the duty of prudence and let's just talk about the duty of loyalty. And the problem with that is to set forth a loyalty claim, you have to have first a conflict between the fiduciaries and the plan participants or beneficiaries, and then second, you have to show that the fiduciaries acted on that conflict in a way that caused losses. So going to the first part first, the conflict, they don't plausibly allege any conflict here as this Court already held in the first round of this case, Cop 1, that to be sure then went to the Supreme Court, was vacated by the Supreme Court in light of Fifth Third, and sent back. But the fact that it was vacated in light of Fifth Third doesn't necessarily mean that the Supreme Court thought this Court got it wrong. It just means that this Court should take another look at it. This Court's been very clear about the effect of a GDR. And so the real question here is, is there anything in Fifth Third, anything new? When you say take another look at it, you're contending that that doesn't revive the duty of loyalty claim, that it doesn't warrant a second look? Yes. I think the question is, you take a look at it and you ask, in light of a GDR, what is there new that would require or that would warrant a second look? If there's nothing new, then Fifth Third didn't add anything new on the conflict issue, which is, again, what we're talking about here. So therefore, under this Court's precedence in light of what you do in a G — in light of a GDR, you look to whether or not there's any new circumstances. Since there's no new circumstances, you not only can but should stick with the Court's initial resolution of this particular issue, because the Supreme Court didn't address this issue. And I think even if you — But the point is that, I mean, irrespective whether the Supreme — you know, we reconsider it, but there's no material change in the allegations pertaining to the duty of loyalty, right? That is correct, Your Honor. Okay. Exactly. And again, what they kind of — I think there was an interesting colloquy with Judge Jones and my friend a moment ago where, you know, Judge Jones pressed, well, what is the nature of the conflict? And they don't really allege that there is any conflict between these — these fiduciaries and the planned participants. Everybody has an interest in having the company stock do well. That's why Congress wanted to encourage these kind of plans in the first place. And they have disclaimed an argument that planned fiduciaries — excuse me, that company insiders can't be fiduciaries, which is understandable because that's specifically allowed by ERISA 1108C3 and would be very radical. And what they say is kind of a puzzling thing. They say, well, we're not saying that that in itself is a problem. We're saying the problem here is that they acted in a way that was inconsistent with the interests of planned participants. But that doesn't actually answer the question of how there was a structural conflict here. I mean, again, there's two steps in a duty of loyalty analysis. Conflict of interest, and then second, you have to act on that conflict in a way that causes losses to the plan. And they are trying to kind of elide the conflict and just kind of assert a conflict in very conclusory fashion without putting any meat on the bones there. And so, again, based on what this Court did in Fifth Third itself, this Court can dismiss the loyalty claim or affirm the dismissal of the loyalty claim based on what the Court already said in the first round of this, that they haven't plausibly alleged conflict. But even if you got beyond the conflict point and you got to the acted in reliance on the conflict, here the duty of loyalty claim is derivative of the duty of prudence claim. Because what is the action that they said was taken that is violative of the duty of prudence claim? So they're not alleging any action in this case that is independent of their prudence claim. The thing they're complaining about in their loyalty claim is the exact same act that underlies their prudence claim. So if they don't have a prudence claim for the reasons that I've been discussing here this morning, then by definition they can't show that an independent fiduciary would have taken a different course or that this was imprudent. So in the absence of a substantive prudence claim, at least the way they have framed their loyalty claim, it doesn't work. It doesn't add anything. Well, let me just go back to the facts here, because as I recall it, and I could be getting the dates a bit wrong, the stock peaked around 2006. Throughout 2007 it started to go down a little bit, right? And then by the end of 2008, which is what the material allegations focus on here, the stock was, what, it had been 36, it was already down quite a bit. I think any of us who lived through it remember those days of late 2008. Well, approximately, because eventually was it down to 3 by that point, or was it not down that far? I remember it was sliding very precipitously in the fall of 2008, and the company declared bankruptcy in 2009. And of course, there were meetings of the board during this period, and they actually decided to stop investments in company stock during this period, which again, somewhat is inconsistent with their argument that these folks weren't even at the switch here. I mean, obviously, these folks were, you know, very involved in the company and really knew all this stuff. But I think the point is, that itself doesn't make for a conflict. I mean, they still had — this is very different, I think, as Your Honor at least suggested by your questions earlier than Perez, where there was a structural conflict of interest between what the fiduciaries wanted and what the plan participants wanted. I mean, everybody would have been a winner here if the stock had gone up. And the fact that the stock is sliding greatly doesn't in and of itself create a conflict, and nor does it create the basis for a prudence claim, because as the stock price goes down, again, the market presumably is valuing that. It is a risky stock, but the fact that a stock is risky, again, in and of itself does not mean that it's imprudent. It's not imprudent to hold risky stock as long as it's diversified. And so, again, I mean, I think they're just kind of describing the facts by saying that the stock price went down precipitously, but that doesn't give rise to a prudence claim or a loyalty claim. So, again, I think, just looking at this case from 30,000 feet, to the extent that the Supreme Court left any room for these kind of claims in light of Fifth Third, it is very, very narrow room. I mean, it's somewhat unusual what the Supreme Court did in Fifth Third, actually, which is to, after having done away with the presumption of prudence in saying that it's not in the statute, and so there's no basis for buying that presumption, the Supreme Court said, but, aha, let me say, essentially what the Court said is, we understand where that presumption, the concerns that were driving that presumption, and the concerns were basically things that, instead of making up a presumption, what the Court should do is just apply the Iqbal Twombly standard with rigor. And that is exactly what the district court here did. The district court looked at these allegations and said, I don't see a basis for an insider trading claim, because they haven't shown that this would either not violate the laws, or under this Court's standards in Whitley, which is the post Fifth Third in this Court, you know, not do more harm than good, or I don't see the basis for a As to the real underlying facts here, I should have read the complaint better. Were these plaintiffs just holding on to their stock, or did they have some automatic accession to their holdings? They were holding on, so this is different. So they can't file under 10b-5? Well, they have a securities claim, because Not unless you have a purchase or sale. Well, I guess that's true. You're right. I mean, whatever rights they would have as securities holders, they would have those rights. But, yeah, you're right. They wrote it all the way down into bankruptcy. That's true. But I guess the one point is to keep in mind here that this is not a situation like Enron where these people were essentially trapped into having to keep these stocks. This was a situation where company stock was an option, and frankly, it was in the I see my time has expired. Thank you very much. Okay. Thank you. Just a few quick points. First, I think that he's conceded that you, after the GVR, should look at the loyalty claim again. Second, if you look at the complaint at paragraphs 310 to 320, it details specifically what the conflicts are. And just to offer a couple of ideas, for example, several of the defendants received substantial bonuses for the year of 2008 because of the positive performance of the company during 2008, which they would not have gotten if everything had become public during 2008, if something had happened so that the unraveling had happened a little bit faster. Also, as we discussed earlier, the misrepresentations by the defendants on the You said if everything had become public. Yes. But didn't you at least say in your brief that you were not going to talk about non-public information? We have not raised, we're not raising a claim for this panel about the non-public information because you have this decision in Whitley, which makes those claims very difficult. And so that's not an easy claim for us in light of Whitley. So I'm not raising it. I'm trying to raise the claims that are easy. And perhaps the claims I've raised aren't all that easy, but they're easier than the claims in light of Whitley. As far as what the alternatives were, the complaint lists specific alternatives at 296 to 301. They could have stock buying stock. He says they stopped buying stock. No, they talked about stop buying stock, but then they changed their mind two days later and didn't do it. And it's possible that if they stopped buying stock during 2008, which they didn't do, that that might have unraveled before these people would get these very large bonuses they got because of the performance during 2008. Also, your opinion in Perez, the last few sentences of Subpart 2B, one of your comments was very clear that we don't have to prove some other loss. The loss is clear. The value of their pension plan is destroyed. We have to prove that they did something not in the interest of the beneficiaries. And after that, we've got the loss. We have to prove that they had a conflict and that they didn't act with an eye singled to the interest of the beneficiaries. You explained that very well in the last few sentences of that opinion. So there's no chance that this is subsumed. With respect to this idea that there's no loss, the same thing is true for Tibble. If you look at the twin decisions in Tatum from the Fourth Circuit about Tibble, they say, yeah, you alleged these people didn't think about what to do, and so you've got a violation here. And their remedy for that is that means that the fiduciaries have to prove that what they did was the right thing as opposed to us having to prove that what they did was wrong. With respect to the last thing I'd like to say, with respect to this idea that the risk and value is the same, I just encourage you to read Part 4A of Dudenhofer really carefully and read it as if you're trying to figure out what they were actually saying. And I'll just read one sentence from it, and you'll see the key thing to see is the Fifth Third complaint raised claims about risk, and they mentioned those in the fact statement, but that has nothing to do with what they're talking about in 4A. They say, in our view, where a stock is publicly traded, allegations that a fiduciary should have recognized from publicly available information alone that the market was over or undervaluing the stock are implausible as a general rule. Of course they are. Okay? Of course they're, you know, if that's what Exxon stock is worth on the Dow Jones and you don't know anything other than public information, it's hard to say that's the wrong price. Okay? But that's totally different from a claim that this is not the kind of thing that people who are about to retire should be investing in. Well, how do you prove overly risk, over riskiness? Google S&P 500 high beta, and you'll see the market knows there's stocks that are high beta, there's stocks that are low beta, and suppose you put an expert witness. But the stock is all, I mean, you're not even complaining about when the stock went down 50%. I'm not complaining the stock price fell. That's not my complaint. My complaint is that these people were old, they had a retirement plan. If you got an expert witness to say, what is the range of betas for which people in these retirement plans should be investing? And they said, this stock, the range is about here, and this stock's beta is way over here, a prudent fiduciary would have done something to respond to that situation because of the beta of the stock. But the problem is these people already, I mean, the problem is these people are holding on to the stock. But they're also getting stock bought for them every quarter or month, I don't know. That's what I was asking, Mr. Blunt. They talked about stopping buying, but then for some reason, we don't know why, two days later, they immediately scotched that plan and kept buying. But, I mean, they couldn't, you're saying that they turned on, that they're They talked about turning off the spigot, but they didn't do it. But all that is in your complaint. The first few pages of the complaint, that's the introduction of the complaint, is they came to a point where it was really bad, everybody knew it was bad, it was publicly bad. You knew it was bad, he knew it was bad. I lived in New York at the time, didn't know it was bad. And they didn't stop. Okay. Thank you. Very interesting. Thank you.